UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| DANIEL B. LOCKE et al., )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>EDWARD A. KARASS, State Controller, )<br>et al., )<br>)<br>)<br>Defendant. | Docket No. 05-cv-00112-P-S |

**ORDER ON MOTION FOR PRELIMINARY INJUNCTION**

Before the Court is Plaintiffs' Motion for a Preliminary Injunction (Docket # 6). Plaintiffs are state employees who have declined to become members of the Defendant Maine State Employees Association ("nonmembers" of the "MSEA"). Plaintiffs seek to enjoin the Defendants from collecting service fees from the named plaintiffs and others similarly situated.[1]  Plaintiffs bring their claim under 42 U.S.C. § 1983, claiming that the procedure implementing the service fees is unconstitutional under <u>Teachers Local No. 1 v. Hudson</u>, 475 U.S. 292 (1986).  More specifically, Plaintiffs allege that notice provided to them by the MSEA explaining the service fees is constitutionally inadequate. Plaintiffs seek a preliminary injunction barring the collection of the service fees until the Court can resolve the underlying dispute.   Oral argument was held on this matter on July 26, 2005, and at the end of that hearing the Court orally DENIED Plaintiffs motion.  The Court now issues this written order reiterating and expanding upon its oral ruling.

---

[1] A Motion for Class Certification is currently pending before the Court.  (<u>See</u> Docket # 5.)  Because the Court has denied Plaintiffs' motion for a preliminary injunction, the Court need not decide whether the injunction should apply to the entire class absent class certification.

## I. BACKGROUND

For purposes of Plaintiffs' Motion for a Preliminary Injunction, the Court finds the relevant facts as follows:

MSEA and the State of Maine recently negotiated a provision in their collective bargaining agreement requiring all nonmembers of the MSEA to pay service fees to the union. The agreement sets forth certain procedural requirements that the union must follow in calculating and promulgating the fee, including notice, financial disclosure, and an opportunity to dispute the fee. (See Agreement Between the State of Maine and the Maine State Employees Association, 2005–2007 (Docket # 23, Ex. 2) at 55–60 (hereinafter the "CBA").) Also, according to the CBA, employees hired prior to July 2, 2003 who have not been members of the MSEA or fee payers since that date are considered "grandfathered," and will be required to pay only 50 percent of the service fee until June 2006. The named plaintiffs in this case are grandfathered nonmembers subject to this discount.

On April 11, 2005, MSEA mailed out a notice to all employees explaining the new service fees. (See April 11, 2005 Letter to MSEA-SEIU Bargaining Unit Members (Docket # 23, Ex. 3) (hereinafter "the April Notice").) The notice calculated the service fee as 73.8 percent of member dues. This calculation was based on the 2003 fiscal-year data of the MSEA and the 2002 fiscal-year data of their national affiliate, the Service Employees International Union ("SEIU"). In calculating the service fee as a percentage of member dues, the notice categorized expenses as either "chargeable" or "non-chargeable" to the nonmembers depending on the union's determination of whether the expense was "germane to collective bargaining and contract administration as defined by

law." (CBA at 55.)   The notice indicated that the financial data was verified by an independent auditor.

On June 10, 2005, the MSEA mailed members another notice providing updated financial information, based on the MSEA's 2004 expenditures and SEIU's 2003 expenditures. (See June 10, 2005 Letter re: Verified Statement of Certain Rights Regarding Dues and Fees (Docket # 23, Ex. 4) (hereinafter "the June Notice").)

On June 16, 2005, Plaintiffs filed the instant lawsuit, challenging the constitutional adequacy of the notice provided to nonmembers about the service fee.

On July 12, 2005, MSEA mailed all nonmembers a revised notice that superseded the April Notice and the June Notice. (See July 12, 2005 Letter re: Payment of Service Fees to MSEA-SEIU (Docket # 23, Ex. 5) (hereinafter "the July Notice").)  The July Notice reclassified the union's organizing-related expenditures as non-chargeable to nonmembers. As a result, the service fee was reduced to 49.13 percent of member dues. Thus, "grandfathered" nonmembers such as Plaintiffs will be assessed only 24.57 percent of member dues under the new notice. The July Notice also contained updated affidavits and an auditor's statement certifying that the new calculations remain consistent with the audited financial data disclosed in the June Notice.

The MSEA has given nonmembers an opportunity to challenge the July Notice by August 16, 2005. Members that have challenged any of the three notices are scheduled to participate in an arbitration with the American Arbitration Association on October 28, 2005.[2]  The July Notice states that nonmembers challenging the service fee calculation will have their service fees placed in an interest-bearing escrow account pending

---

[2] Plaintiffs do not appear to challenge the validity of the arbitration under Hudson, but to the extent that they do, the Court finds it to be adequate.

3

resolution of the arbitration. The MSEA further represents to the Court in a sworn declaration by the union's General Counsel that *all* funds collected from *all* nonmembers will be escrowed subject to the determination of the arbitrator in October. (See Belcher Decl. (Docket # 24) ¶ 17.)

Plaintiffs are now seeking a preliminary injunction to prevent the union from collecting the service fees. The MSEA has stated that it would begin deducting the fees from nonmembers on or after July 27, 2005.

## II.  LEGAL STANDARD

For Plaintiffs to prevail in their motion for a preliminary injunction under Rule 65(a) of the Federal Rules of Civil Procedure, they bear the burden of demonstrating (1) a likelihood of success on the merits, (2) irreparable injury, (3) that such injury outweighs any harm to the defendant, and (4) that the injunction would not harm the public interest. See, e.g., Largess v. Supreme Judicial Court, 373 F.3d 219, 224 (1st Cir. 2004). "The decision whether to grant relief is based on a balancing of the different factors, with likelihood of success playing a pivotal role." Id.

## III.  DISCUSSION

The Court has carefully considered the record before it and the arguments of the parties. The Court finds that Plaintiffs have not made a sufficient showing to obtain a preliminary injunction in this case. Specifically, Plaintiff has failed to demonstrate a likelihood of success on the merits. Most of Plaintiffs' Complaint is mooted by Defendants' superseding July 12, 2005 notice. Those claims either not mooted or raised

for the first time by the July Notice appear unlikely to succeed on various other grounds. Furthermore, Plaintiffs' request for a preliminary injunction must also be denied because Plaintiffs have failed to demonstrate that the injunction is necessary to prevent irreparable injury.

### A. Likelihood of Success on the Merits

1. *Applicable Law*

It is constitutionally permissible for unions to enter into collective bargaining agreements with public employers that require nonmembers to contribute dues to the union in order to avoid "free riders." See Abood v. Detroit Bd. of Educ., 431 U.S. 209, 223–224 (1977). "Employees can be made to pay both the direct costs associated with negotiating and administering collective-bargaining agreements and their share of the indirect expenses a union reasonably incurs in performing its duties as their exclusive representative." Romero v. Colegio de Abogados de Puerto Rico, 204 F.3d 291, 297 (1st Cir. 2000). However, the First Amendment prohibits such fees from being used for "ideological activities not 'germane' to the purpose for which compelled association [is] justified: collective bargaining." Id.

In Local No. 1 v. Hudson, 475 U.S. 292 (1986), the Supreme Court found that the First Amendment demands that public-employee unions follow certain procedures to protect the speech and associational rights of nonmembers. These constitutional requirements include providing (1) "an adequate explanation of the basis for the fee," (2) "a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker," and (3) "an escrow for the amounts reasonably in dispute while such

5

challenges are pending." Id. at 310.

Plaintiffs challenge only whether the MSEA has complied with the first requirement of Hudson. Plaintiffs also challenge whether there was "a good-faith advance reduction" of nonmembers' fees to account for non-chargeable activities.[3]

In Hudson, nonmembers of the local teachers' union challenged the constitutionality of a service-fee provision in the collective bargaining contract between the union and the city. Id. at 297. The union determined that nonmembers should pay ninety-five percent of the dues charged to members. Id. at 295. However, the union provided little information to members explaining the basis for this calculation. Id. at 306–307. The union also established a procedure for objecting to the service fees. Id. at 296. Nonmembers could object to the ninety-five percent figure within thirty days after the first deduction from their paychecks. Id. Objections would be considered first by the union's Executive Committee, then by the union's Executive Board, and finally by an arbitrator selected by the union's president. Id. If the objector prevailed, she would receive a rebate of any fees found to be wrongfully deducted. Id. All other nonmembers would have future fees reduced by the same amount. Id.

The Court ruled that the procedures established by the union were insufficient to protect employees' First Amendment rights against compelled speech and association. Id. at 310. It ruled that nonmembers' collections must be placed in escrow, rather than simply refunded from union coffers. Id. It also ruled that the arbitration process must be more independent from the union. Id. at 308.

The Court also found that the union had provided nonmembers with inadequate

---

[3] Plaintiffs assert that this alleged "good-faith advance reduction" requirement is an implicit fourth prong of Hudson. The Court does not agree that such a claim falls under Hudson, as it explains in Part III.A.4 *infra*.

6

information about the basis for the proportionate share calculation. See id. at 306. The Court held that the union, not the nonmembers, bears the burden of proving that the ninety-five percent figure was correct. Id. Therefore, the union should have provided details of the fee calculation to all nonmembers regardless of whether they filed an objection to the fees. Id. Specifically, the union should have detailed "the expenditures for collective bargaining and contract administration that had been provided for the benefit of nonmembers as well as members — and for which nonmembers as well as members can fairly be charged a fee," not just "the amount that [the union] admittedly had expended for purposes that did not benefit dissenting nonmembers." Id. "Major features" of the disclosure to nonmembers should include "major categories of expenses" and "verification by an independent auditor." Id. at 307 n.18. However, the Court noted that "absolute precision" in the calculation of the fee "cannot be expected or required." Id.

In arguing that they have a likelihood of success on the merits, Plaintiffs rely heavily on Hudson. However, as discussed below, Hudson and its progeny simply do not support Plaintiffs' position as applied to the specific facts of this case.

2. *Mootness*

Many of Plaintiffs' arguments in its motion were addressed by the MSEA's July Notice, which superseded the April and June Notices. This notice used updated financial data, declared organizing expenses to be non-chargeable to nonmembers, provided some additional disclosure regarding SEIU expenditures to local affiliates, and reduced the service fee to 49.13 percent of member dues. These changes address some of the most

7

serious charges brought against the union by Plaintiffs. Seeking to preserve these claims, Plaintiffs argue that the mootness doctrine should not apply in this case because the allegedly illegal conduct was ceased voluntarily.

Article III of the Constitution prohibits federal courts from deciding cases or controversies that have been rendered moot by subsequent events. United States v. Reid, 369 F.3d 619, 624 (1st Cir. 2004). Courts must find a case moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome of the controversy. Thomas R.W. v. Mass. Dept. of. Educ., 130 F.3d 477, 479 (1st Cir. 1997). Even if an actual case or controversy exists at the start of litigation, a case may be rendered moot "if changed circumstances eliminate any possibility of effectual relief." Me. Sch. Admin. Dist. No. 35 v. R., 321 F.3d 9, 17 (1st Cir. 2003).

However, the mootness doctrine contains an exception for voluntary cessation of allegedly illegal conduct. See United States v. W. T. Grant Co., 345 U.S. 629, 632 (U.S. 1953). Voluntary cessation will only moot a dispute when (1) there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation. See Aroostook Band of Micmacs v. Ryan, 404 F.3d 48, 70 (1st Cir. 2005). The burden is on the Defendant to establish these factors. Id.

The Court notes first that the primary purpose of the constitutional doctrine set forth in Hudson, on which Plaintiffs base their suit, is designed to protect Plaintiffs' funds from being used for ideological or other non-chargeable purposes. In determining whether the July Notice moots Plaintiffs claims under the April Notice, the Court must not lose sight of the fact that it is Plaintiffs' substantive First Amendment rights that are

8

ultimately at issue in this case. If there is no realistic possibility that Plaintiffs' funds will actually be used for unconstitutional purposes, Plaintiffs procedural arguments are ultimately fruitless.

Plaintiffs point out that the voluntary cessation exception prevented the Supreme Court in Hudson from considering changes made by the defendant union to its service fee arrangement during the course of that litigation. See Hudson, 475 U.S. at 305 n.14. However, Hudson is distinguishable from the present case. In Hudson, the union placed the disputed service fees in escrow during the course of the litigation in a likely attempt to evade judicial review. The change was made entirely at the defendant's discretion with no notice or procedural safeguards for the plaintiff nonmembers. As the lower court explained, the union had "no commitment to continue the escrow in the future [and] had not indicated the terms of the escrow." Id. at 300. In contrast, the MSEA's July Notice was made according to a fixed procedure set forth in the CBA. That agreement requires that nonmembers be provided notice of the service fee — including financial data regarding how it was calculated — and an opportunity to object to the fee's calculation or imposition before an impartial mediator. In short, the concerns that underlie the "voluntary cessation" exception to the mootness doctrine — that actors will change their positions for the purpose of avoiding litigation only to revert to their old ways when the threat has passed — is not applicable in this case, in which the actor is legally and contractually obligated to provide potential victims significant procedural rights upon every change in policy. Were there some indication that Defendants were unable or unwilling to live up to the obligations to nonmembers expressed in their collective bargaining agreement, the Court might rule differently. However, the Court sees no

reason in the record to believe this to be the case.

Furthermore, Plaintiffs' complaint about the accuracy and adequacy of the financial data disclosed by Defendant in the April Notice is mooted for another reason: with the July Notice, Defendants have now provided much of the financial information sought by the Plaintiffs, arguably enabling them to exercise their constitutional right to object to the fee calculations. Defendants cannot now "revert to their old ways" as far as these Plaintiffs go — they cannot erase the provided information from the minds of the Plaintiffs.

Because the July Notice supersedes the April Notice, many of Plaintiffs arguments are now moot. Plaintiffs' argument that the 2003 financial data for the MSEA provided in the April Notice is "stale" is mooted by the union's provision of 2004 financial data in the July Notice. Plaintiffs' argument that "organizing" is not a chargeable activity is mooted by the July Notice's recategorization of "organizing expenses" to the "non-chargeable" category. Finally, Plaintiffs argument that the SEIU failed to disclose the nature of funds paid to SEIU affiliates is mooted by the provision of notes by the SEIU's auditor in the July Notice, explaining the basis for dividing these "payments to locals" between chargeable and non-chargeable expenses.[4]

3. *Issues Not Corrected or Newly Arising in the July Notice*

The Court turns now to the issues raised by Plaintiffs that are either not mooted

---

[4] In their Reply (Docket # 30), Plaintiffs maintain that the July Notice did not correct the inadequate disclosure of payments to local affiliates. However, Hudson clearly states that only "major categories of expenses" are required in the financial disclosure. Hudson, 475 U.S. at 307 n.18. The Court finds that the breakdown of expenses (July Notice at 23) coupled with the auditor's notes explaining the allocation of funds within the category (id. at 27) fully complies with the requirements of Hudson and provides nonmembers with sufficient information to determine whether or not to object.

by the July Notice or raised for the first time by the July Notice.

a. *Sufficiency of the audit*

Plaintiffs' argument that the financial disclosures in the July Notice were "reviewed" rather than "audited" by an independent auditor is without merit. Plaintiffs cite a Ninth Circuit case for the proposition that Hudson's prescription of "verification by an independent auditor," 475 U.S. at 307 n.18, requires a specific type of audit that provides "at least some verification of the amounts disclosed in the financial statement." Prescott v. County of El Dorado, 177 F.3d 1102, 1106–1107 (9th Cir. 1999). However, even if this Court were to accept the distinction urged upon it by Plaintiffs, the letter from the auditor included in the July Notice (July Notice at 11) establishes to the Court's satisfaction that a full audit of the union's 2004 fiscal year as defined in Prescott was undertaken.

While the auditor did not conduct an entirely new audit after the MSEA's decision to recategorize organizing expenses from chargeable to non-chargeable, it is implausible that Hudson requires such an undertaking. The recategorization of an expense from the chargeable to the non-chargeable category is the decision of the union, not the auditor. It is not clear to the Court that Hudson requires *any* review of such policy changes by an auditor. However, if review is required, the review provided by the MSEA's auditor was certainly sufficient. It is clear from the record that the auditor examined the union's recalculation of the service fees under the new formula and confirmed that it properly utilized the 2004 financial data, which had previously been fully verified by the auditor, in making its calculation. The Court is entirely satisfied that

11

this undertaking by the auditor fully satisfies the requirements of Hudson, if indeed it does not surpass them.

      b. *Use of allegedly "stale" and incompatible financial data*

Plaintiffs argue that the SEIU financial data from 2003 used in the July Notice is still "stale" and is incompatible with the use of MSEA's 2004 financial data. This claim is unavailing. Contrary to Plaintiffs' arguments, Hudson cannot be read as holding that financial data over one year old renders a notice per se unconstitutional. In approving the union's use of year-old financial data, the Hudson court was expressing the view that courts should take a forgiving approach in reviewing financial disclosures, noting that "absolute precision in the calculation of the charge to nonmembers cannot be expected or required." 475 U.S. at 307 n.18.

For the same reason, the Court finds that use of financial data from different years for the MSEA and the SEIU respectively in the July Notice is permissible under Hudson. Although the result would obviously be at least slightly different had the union used 2004 data for both the SEIU and the MSEA,[5] any small discrepancies caused by the use of different data are as likely to benefit the nonmembers as harm them in the short term. Furthermore, such discrepancies will entirely average out over the long term. Thus, absent any evidence of intentional "cherry picking" of financial data by the union to increase its fees, the Court finds no constitutional problem with the use of a different year's financial information for an affiliate.

---

[5] Defendant MSEA admits as much in its Response (Docket # 23), noting that the service fees would have been higher had the union used 2003 data for both unions in calculating the proportionate share.

c. *Adequacy of time between notice and collection*

The July Notice was mailed on July 12, 2005. Nonmembers have until August 16, 2005 to object. However, fees may be collected as soon as July 27, 2005. Plaintiffs argue that this timeline is simply too compressed to protect nonmembers' First Amendment right to object to the fee calculation.

The Court agrees with Plaintiffs that Hudson's admonition that service fees cannot be used for non-chargeable expenses even if they are later refunded strongly implies that notice of the service fee must allow time for nonmembers to assess the union's financial disclosures and decide whether to object before the fee is collected. However, given the specific deadlines at issue in this case, the Court is not convinced that there is any violation of Hudson.

Plaintiffs do not explain why they believe that two weeks constitutes inadequate notice. They complain merely that the deadline for objection is three weeks after the fees will be collected. However, the Court does not believe that the August 16, 2005 deadline is relevant to the analysis under Hudson. It is the date on which collection of the fees begins that threatens to cause injury to Plaintiffs. In this case, the Court finds that the July 27, 2005 deadline for collection provides an adequate period for objection prior to collection under Hudson. Plaintiffs were given two weeks to review the July Notice and object before collection of fees would begin. There is nothing to stop nonmembers concerned about their rights from objecting within this period.

4. *Categorization of certain activities as chargeable*

Although the July Notice renders most of Plaintiffs' claims about the

categorization of expenses moot, any remaining claims of miscategorized expenses are unlikely to succeed for an additional reason.  Plaintiffs rely on Hudson in presenting their claim that the April and July Notices miscategorize certain expenses as chargeable.  They assert that Hudson requires unions to make a good-faith effort to determine the correct proportionate share in advance, a determination that is then challengeable in District Court.

The Court does not agree with this interpretation of Hudson.  It appears to the Court that Hudson is focused solely the adequacy of the notice to the nonmember — in other words, whether the notice gives the nonmember enough information to decide whether to object.  There is no implicit "fourth prong" of Hudson imposing an additional substantive requirement that the notice get the categorization of expenses correct.  Assuming the union's notice is adequate enough to protect nonmembers' ability to determine whether to object, Hudson holds that an impartial arbitrator and the escrowing of objectors' fees pending resolution of the complaint is sufficient to safeguard the nonmembers' constitutional rights.  The Court notes that several Circuits, including the Second, Third, Fourth, Ninth, and Eleventh have held that an escrow of service fees that complies with Hudson's requirements adequately protects nonmembers' First Amendment rights.  See Grunwald v. San Bernardino City Unified Sch. Dist., 994 F.2d 1370, 1374 (9th Cir. 1993), Gibson v. The Florida Bar, 906 F.2d 624, 631 (11th Cir. 1990), *cert. dismissed*, 112 S. Ct. 633 (1991); Crawford v. Air Line Pilots Ass'n Int'l, 870 F.2d 155, 161 (4th Cir. 1989); Hohe v. Casey, 868 F.2d 69, 72 (3d Cir.), *cert. denied*, 493 U.S. 848 (1989); Andrews v. Education Ass'n, 829 F.2d 335, 339 (2d Cir. 1987).[6]

---

[6] The First Circuit has not directly considered the issue, although it has decided a case involving the use of bar dues for ideological purposes that strongly suggests it would consider an "objection-and-escrow"

14

Indeed, these holdings seem to best comport with the Supreme Court's suggestion in <u>Ellis v. Brotherhood of Railway, Airline & Steamship Clerks</u> that "advance reduction of dues and/*or* interest-bearing escrow accounts" would protect nonmembers from any First Amendment violations. 466 U.S. 435, 444 (1984) (emphasis added).

In this case, the MSEA represented in its July Notice that it will place the service fees of all objectors in escrow pending the resolution of the October arbitration. The General Counsel of the MSEA has also stated in a sworn declaration that the MSEA will hold <u>all</u> service fees collected from nonmembers in escrow until the resolution of the October arbitration. (Belcher Decl. (Docket # 24) ¶ 17.) Plaintiffs do not challenge this sworn statement and the Court sees no reason to disbelieve it. Given this state of affairs, it appears clear that there is no constitutional violation under <u>Hudson</u> even if Plaintiff is correct that the union has miscategorized expenses as chargeable.

**B. Irreparable Injury**

In addition to the grounds already stated for denying Plaintiffs' motion, the Court does not believe that Plaintiffs have adequately demonstrated that a preliminary injunction is necessary to prevent irreparable injury. There can be no doubt that inadequate or inaccurate notice by a union seeking to collect service fees could result in nonmembers failing to object to truly unconstitutional fee calculations, thereby resulting in the use of their service fees for ideological or other nonchargable purposes. Such an injury may well be irreparable. See <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably

---

procedure to be appropriate. See <u>Schneider v. Colegio de Abogados de Puerto Rico</u>, 917 F.2d 620 (1st Cir. 1990). Only the Sixth Circuit — whose cases Plaintiffs rely upon heavily — requires a good faith attempt by the Union at advance reduction in addition to escrow of challenged funds.

constitutes irreparable injury.") However, in determining whether there will be irreparable First Amendment injury absent an injunction, the Court must examine not only whether the claim involves First Amendment freedoms generally, but also whether the facts of the case suggest actual substantive First Amendment harm is imminent. Cf. Rushia v. Ashburnham, 701 F.2d 7, 10 (1st Cir. 1983) (holding that a preliminary injunction declaring a law prohibiting the display and sale of indecent publications to minors unconstitutional was unnecessary for lack of irreparable injury where the plaintiff-storeowner did not allege that he was deterred by the threat of prosecution under the law). As noted above, the union intends to place all nonmember funds in escrow pending the determination of the arbitrator.[7] Thus, given this arrangement, the Court cannot see how Plaintiffs' or putative class members' constitutional rights could be irreparably harmed. Rather, it appears that Plaintiffs' constitutional right against compelled speech will be protected until their case is heard by the arbitrator.

Finally, the Court has already discussed the effect of the superseding July Notice on Plaintiffs' likelihood of success on the merits. The Court also finds that, irrespective of whether the July Notice moots Plaintiffs' claims under the April Notice, the July Notice ameliorates the risk of irreparable injury with regard to alleged problems with the April Notice insofar as they were corrected in the July Notice. Even if the "voluntary cessation" exception were to apply, the July Notice is still legally and contractually binding upon the MSEA. Therefore, the alleged problems of the April Notice pose only an abstract and theoretical risk of harm to Plaintiffs — certainly not a risk requiring the

---

[7] The Court also notes that the named Plaintiffs, as "grandfathered" nonmembers, will be required to pay only half of the service fee until July 2006. Thus, even if the fees were not placed in escrow, the Court thinks it highly unlikely that Plaintiffs will be forced to pay more than their proportionate share prior to July 2006.

16

protection of a preliminary injunction.

## IV.  CONCLUSION

For these reasons, Plaintiffs request for a preliminary injunction is hereby DENIED.

SO ORDERED.

/s/ George Z. Singal  
Chief U.S. District Judge

Dated this 2nd day of August, 2005.