**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| DANIEL B. LOCKE et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 05-CV-112-P-S |
| | ) | |
| EDWARD A. KARASS, State Controller, et al., | ) | |
| | ) | |
| Defendants. | ) | |


**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, ORAL ARGUMENT, MOTION FOR LEAVE, AND RENEWED MOTION FOR CLASS CERTIFICATION**

SINGAL, Chief District Judge

Before the Court are three motions for Summary Judgment: the Motion for Summary Judgment filed by Defendants Edward A. Karass, Controller of the State of Maine, Rebecca M. Wyke, Commissioner of the Maine Department of Administrative and Financial Services, and Kenneth A. Walo, Director of the Bureau of Employee Relations of the State of Maine ("State Defendants") (Docket # 64); Plaintiffs' Motion for Summary Judgment (Docket # 67) and associated Motion for Oral Argument/Hearing (Docket # 74); and the Motion for Summary Judgment filed by Defendant Maine State Employees Association ("MSEA" or "Union") (Docket # 73). In connection with these motions, Plaintiffs also filed their Motion for Leave to Exceed Page Limits in Support of their Motion for Summary Judgment and in Opposition to Defendants' Motions for Summary Judgment ("Motion for Leave") (Docket # 89).

1

For the reasons laid out below, the Court GRANTS Plaintiffs' Motion for Leave,[1] DENIES Plaintiffs' Motion for Summary Judgment and Oral Argument, and GRANTS Defendants' Motions for Summary Judgment.

In addition to the cross-motions for summary judgment, there is also pending before the Court Plaintiffs' Renewed Motion for Class Certification (Docket # 55). At the February 1, 2006 hearing on this Motion, the Court indicated that it would reserve ruling on the issue of class certification until after it had ruled on the pending motions for summary judgment. In light of the Court's decision on these motions for summary judgment, the Court concludes that Plaintiffs' Renewed Motion for Class Certification is MOOT.

## I.  STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993). The Court views the record in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. See McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In

---

[1] Although the Court is troubled by Plaintiffs' flagrant violation of Local Rule 7(e) in submitting a Motion for Summary Judgment (Docket # 67) more than double the page limit without leave of the Court, it finds that reading the entirety of the filing does not change the outcome of the Order, and therefore considers it.

determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.  Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).  Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."  Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e).  "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party."   In re Spigel, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

This standard is not altered by the fact that cross-motions for summary judgment have been filed in this case. See, e.g., Blackie v. State of Me., 75 F.3d 716, 721 (1st Cir. 1996).  In the context of this case, the Court notes that the relevant facts are essentially undisputed. Nonetheless, based on the Court's determination that Defendants are entitled to summary judgment, below the Court resolves any factual disputes and make all rational inferences in favor of Plaintiff.  See Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 34 (1st Cir. 2005).

## II.  BACKGROUND

Since 1979 the State of Maine ("the State") has had a collective bargaining agreement with Defendant MSEA.  The MSEA is the exclusive bargaining agent for state Employees within four Bargaining Units: Administrative; Operations, Maintenance, and Support; Professional and Technical; and Supervisory Services ("Bargaining Units").  Prior to 2003, State Employees who

worked in one of these Bargaining Units ("Employees") and were members of the MSEA were required to pay union dues as a condition of employment.  State Employees who worked within one of the Bargaining Units but who were not members of the MSEA ("Nonmembers") were not required to join or make any payments to the MSEA.  This changed in 2003 when the MSEA and State agreed to place a "union security" provision in the 2003-2005 collective bargaining agreement.  This provision required that all newly hired Employees either become union members or pay a "service fee" to the MSEA.  (See Agreement Between the State of Maine and the Maine State Employees Association, 2003–2005 (Docket # 71, Ex. 2) at 80-86.)  The service fee was defined as an amount that each Nonmember must pay for his or her share of the MSEA's collective bargaining and contract administration costs.  (See Id. at 80-81.)

The 2005-2007 collective bargaining agreement (the "CBA") between the MSEA and the State extended this service fee requirement to all Nonmember State Employees.  (See Agreement Between the State of Maine and the Maine State Employees Association, 2005–2007 (Docket # 71, Ex. 2) at 55–60.)  The CBA outlined the procedural requirements that the MSEA would follow in calculating and promulgating the fee.  These requirements included notice, financial disclosure, and an opportunity to dispute the fee.  (Id.)  The CBA contained a "grandfather clause" provision, which allowed Nonmembers hired prior to July 2, 2003 to pay only 50 percent of the service fee until June 2006.  The named Plaintiffs in this case are grandfathered Nonmembers under this provision.[2]  The CBA also included an indemnification provision, whereby the MSEA agreed to indemnify the State for any liability it might incur as a result of the service fee provision.  (Id. at 59-60.)

---

[2] The Plaintiffs in this case are currently being charged only 50 percent of the service fee, which amounts to only 24.57 percent of member dues.  The Court is not convinced that Plaintiffs have established injury under this reduced amount, but nonetheless chooses to disregard this possibility, and assumes for purposes of this Order that the full service fee is at issue.

On April 11, 2005, the MSEA sent a letter to all Employees notifying them of the new service fees, with a four-page attachment containing an explanation of membership, dues, and fees. (See April 11, 2005 Letter to MSEA-SEIU Bargaining Unit Members (Docket # 71, Ex. 3) (hereinafter "the April Notice").) The letter gave the amount of the then-current fee, $6.71 per week, and stated that the full membership fee was only $2.39 more per week. This would make the service fee approximately 73.7% of the membership fee. The letter advised members, however, that "a new fee amount will be implemented in August, based on the Union's 2004 expenditures." (Id. at 2.)

On June 10, 2005, the MSEA mailed a letter to all Employees. (See June 10, 2005 Letter re: Verified Statement of Certain Rights Regarding Dues and Fees (Docket # 71, Ex. 4) (hereinafter "the June Notice").) The letter explained that the service fee reflected "the pro-rata costs of the Union's expenditures that are germane to its representative activities." (Id. at 2.) Union expenses were categorized as "chargeable" or "non-chargeable." Chargeable categories included contract bargaining, administration, and enforcement; publicity and community mobilization in support of public bargaining; litigation related to the union's representational activities; certain types of training; union governance costs; organization and recruitment; certain personnel costs; certain accounting, auditing, and professional consulting fees; and certain administrative expenses. (Id. at 2-4.) Each listed category had a paragraph-long explanation, with examples, of the activity that fell under each category. The Affidavit of Joan Towle, the Director of Finances of the MSEA, was attached to the letter. In it, she stated that based on the MSEA's "audited financial statements for the year 2004," the service fee would be 70.6 percent of the membership dues. (Id. at 6.)

On June 16, 2005, Plaintiffs filed their Complaint (Docket # 1), initiating this action.  On July 12, 2005, MSEA sent a notice to all Nonmembers.  (See July 12, 2005 Letter re: Payment of Service Fees to MSEA-SEIU (Docket # 71, Ex. 5) (hereinafter "the July Notice").)  The July Notice announced the MSEA's decision to reclassify the union's organizing-related expenditures as non-chargeable to Nonmembers.  As these organizing expenditures were a large portion of the MSEA's budget, the service fee was reduced to 49.13 percent of member dues.  Grandfathered Nonmembers were to pay half that, or 24.57 percent of member dues.  This letter gave an even more detailed analysis of the chargeable and non-chargeable categories, and additionally included an audited statement of the exact dollar amount spent by the MSEA in each category.  (Id. at 3-7, 10.)  It also included a copy of the independent auditor's report, which assured Nonmembers that the recategorization and new calculation of the service fee were consistent with the audited financial data from the June Notice.  (Id. at 11-19.)

In the July Notice the MSEA gave nonmembers an opportunity to challenge the service fees by August 16, 2005.  (July Notice (Docket # 71, Ex. 5) at 6).  However, pursuant to the July Notice, which stated that fees would be collected starting with the first payroll period after July 1, the MSEA began collecting service fees from Nonmembers on July 27, 2005.  (Id. at 1.)  As it is unclear whether the objection had to be lodged before the service fee payment was due, the Court, for purposes of summary judgment, assumes that the *de facto* deadline for objecting was July 27, 2005.

In fact, a number of Nonmembers have challenged MSEA's calculation of the service fee, and a hearing on those challenges was held in December 2005 before an independent arbitrator.  The arbitrator has not yet issued a decision, and the MSEA has placed all collected service fees in an independent escrow account pending the arbitrator's decision.  No employee

6

has been terminated for failing to pay the service fee.

On August 8, 2005, Plaintiffs filed their First Amended Complaint (Docket # 47).  In it, they allege first that Defendants have violated their First, Fifth, and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983, and second, that Defendants have entered into an indemnification agreement that is null and void as against public policy.

On October 18, 2005, the State and the MSEA agreed to alter the indemnification clause of the CBA.  (See 2005–2007 Agreement Between the State of Maine and the MSEA-SEIU (Docket # 66, Ex. A).)  The new language inserted in the clause stated that although the MSEA agreed to indemnify the State for any liability costs it might incur from enforcing the service fee provision, "nothing herein shall require Indemnification for any intentional deprivation of an individual's constitutional rights by the State."  (Id. at 2.)[3]

## III.  DISCUSSION

### A.  42 U.S.C. § 1983

Plaintiffs' first claim is that Defendants, under the color of Maine law, violated 42 U.S.C. § 1983 by violating Plaintiffs' First, Fifth, and Fourteenth Amendment rights under the United States Constitution.   Specifically, Plaintiffs claim that Defendants failed to provide Nonmembers

---

[3] The entirety of the indemnification provision, with the October 18 addition in bold, reads:

> MSEA-SEIU agrees that it shall indemnify, defend, reimburse, and hold the State harmless (collectively, "Indemnification") against any claim, demand, suit, cost, expense, damages, or any other form of liability, including attorneys' fees, costs, or other liability arising from or incurred as a result of any act taken or not taken by the State, its members, officers, agents, employees, or representatives in complying with or carrying out the provisions of this Article, including, but not limited to, as a result of being ordered to reinstate an employee terminated at the request of MSEA-SEIU for not paying the service fee; in reliance on any notice, letter, or authorization forwarded to the State by the union pursuant to this Article; and including but not limited to any charge that the State failed to discharge any duty owed to its employees arising out of the service fee deduction; **provided that, nothing herein shall require Indemnification for any intentional deprivation of an individual's constitutional rights by the State.** MSEA-SEIU will intervene in and defend any administrative or court litigation concerning the propriety of any act taken or not taken by the State, including, but not limited to, termination for failure to pay the service fee. In such litigation the State shall have no obligation to defend its act taken or not taken.

constitutionally adequate notice and explanation of the service fee and how it was calculated, in both the April and July Notices, in violation of the requirements laid out in <u>Chicago Teachers Union v. Hudson</u>, 475 U.S. 292 (1986).  Even viewing the record in the light most favorable to Plaintiffs, the Court does not find that Plaintiffs have presented a trialworthy issue on this claim. Plaintiffs raise a number of distinct issues, all arising under 42 U.S.C. § 1983, and the Court addresses them in turn.

### 1.   Constitutionality of Service Fees

The Supreme Court long ago laid out the standards used to determine the constitutionality of union service fees.  In 1977, the Court found that collective bargaining agreements between unions and public employers may require nonmember public employees to make payments to the union.  <u>See</u> <u>Abood v. Detroit Bd. of Educ.</u>, 431 U.S. 209, 223–224 (1977).  This is to avoid the possibility of "free riders," or employees who might take advantage of the union's services without contributing financially to the union.  <u>Id.</u>  However, unions may not simply charge whatever amount they choose in service fees.  In <u>Hudson</u>, the Supreme Court found that unions must follow certain procedures in calculating and collecting the fee in order to protect the First Amendment speech and associational rights of nonmembers.   These constitutional requirements include providing (1) "an adequate explanation of the basis for the fee," (2) "a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker," and (3) "an escrow for the amounts reasonably in dispute while such challenges are pending."  <u>Id.</u> at 310.

In <u>Hudson</u>, the Supreme Court ruled that the local teacher's union failed to meet these constitutional requirements in setting a service fee for nonmember.  There, pursuant to a collective bargaining agreement with the city, the union set the service fee for nonmembers at ninety-five percent of the dues charged to members.  <u>Id.</u> at 295.  The union did not, however, provide

nonmembers with adequate information about the basis for the union's calculation of their proportionate share. Id. at 306.

Although the Court found that "absolute precision" in the calculation of the fee "cannot be expected or required" (Id. at 307 n.18), unions must detail those expenditures, including collective bargaining and contract administration, that benefit nonmembers and therefore warrant a fee collection. Id. at 306. This disclosure should include "major categories of expenses" and "verification by an independent auditor." Id. at 307 n.18. While the union in Hudson failed to provide this information, the MSEA did not. As required, the MSEA provided details of the fee calculation to all Nonmembers, allowing them sufficient information to determine whether or not they wanted to challenge the amount. Id. at 306.

### 2. MSEA's July Notice Supersedes All Previous Notices

In this case, Plaintiffs specifically challenge the constitutionality of both the April and July Notices. As was discussed extensively in the Court's Order on Motion for Preliminary Injunction issued on August 2, 2005, the Court finds that the July Notice superseded the April Notice, and therefore mooted Plaintiffs' claims regarding the April notice. See Locke v. Karass, 382 F. Supp. 2d 181, 187-89 (D. Me. 2005). It is also worth noting that Defendants' June Notice, sent to Employees six days before Plaintiffs filed their first Complaint, superseded the April Notice as well. The June Notice included notice of the service fee, a breakdown of chargeable and non-chargeable categories, and information on how to challenge the fee. Defendants' July Notice corrected any deficiencies that may have existed within the April or June Notices, and was sent two weeks before objections to the service fees were due. The Court does not find any trialworthy issues as to the April or June Notices and determines, as it did at

the Preliminary Injunction stage, that any constitutional deficiencies in the April Notice were mooted by the July Notice.

### 3. The July Notice was Constitutionally Sufficient Under Hudson

#### a. The Independent Audit and Financial Data were Sufficient

The Court has also previously addressed a number of Plaintiffs' arguments regarding the July Notice.  Considering the summary judgment record, the Court remains assured that the independent audit of the MSEA's financial disclosures could be considered either a review (under Hudson) or an audit (under Prescott v. County of El Dorado, 177 F.3d 1102, 1106–1107 (9th Cir. 1999)), and is legally sufficient under either alternative.  The letter from the auditor included in the July Notice (July Notice at 11) establishes that a full audit of the MSEA's 2004 fiscal year, under either Hudson or Prescott, took place.  The Court also finds that the July Notice used data from the most recent year in which audited data was available; in this case, 2004 data from the MSEA and 2003 data from its national affiliate, the Service Employees International Union ("SEIU").  The Court does not find any legal authority for Plaintiffs' argument that the financial data used in the service fee calculation must be from the immediately prior fiscal year; the data available from the most recent fiscal year in which audited data is available is sufficient. The Court therefore does not find that the financial data used in assessing the service fees is stale.  In short, the audits undertaken by the MSEA and the SEIU are wholly sufficient.

Plaintiffs have also argued that the audit was insufficient because no new audit was undertaken following the MSEA's decision to recategorize organizing expenses from chargeable to non-chargeable.  As previously explained in the Order on Motion for Preliminary Injunction, Hudson does not require a union to undertake a new audit when it makes a decision to

recategorize an expense.   A decision to recategorize an expense as non-chargeable is solely within the purview of the union, and not the auditor.   <u>Locke</u>, 382 F. Supp. 2d at 189.

Nonetheless, the MSEA had its independent auditor examine the recalculation and confirm that it properly utilized the 2004 financial data, which had previously been fully verified by the auditor, in making its calculation.  The Court remains satisfied that this undertaking by the auditor fully satisfies, and may surpass, the requirements of <u>Hudson</u>.

### b.   Plaintiffs Were Given Adequate Time to Challenge the Service Fees

Although the announced deadline for objecting to the service fee was August 16, 2005, Plaintiffs insist that any deadline that fell after the July 27th due date for payment of the initial service fee is insufficient.   Plaintiffs' position therefore appears to be that objections can only truly be filed prior to the service fee due date.   Thus, Plaintiffs argue that the July Notice, which was sent on July 12, 2005, did not give Nonmembers adequate time to determine whether or not to challenge the service fee.  The Court previously found that the two-week period between July 12, 2005 and July 27, 2005 was an adequate amount of time for a Nonmember to determine whether or not to challenge the service fee.   To date, Plaintiffs have presented no explanation as to why this two-week period is unreasonable and inadequate.   In short, at the very least, Nonmembers had two weeks prior to the July 27th payment deadline to review the July Notice and to make a decision about whether to challenge the fee.   The Court concludes that, in the circumstances of this case, two weeks is an adequate amount of time to make that determination.

### c.   The SEIU Data was Constitutional Under <u>Hudson</u>

Next, Plaintiffs claim a violation of 42 U.S.C. § 1983 based on the MSEA's continuing to include organizing activity within the calculation of the service fee in violation of <u>Hudson</u>. Although Plaintiffs allege that the MSEA is charging Nonmembers for organizing by both the

MSEA and the SEIU, as well as for the publicity in support of organizing activity, the summary judgment record does not support this allegation.  In fact, the July Notice specifically prohibits charging Nonmembers for such activity.

The July Notice included the MSEA's financial information as well as the entire SEIU auditor's statement, including the auditor's notes.  Plaintiffs concede in the July Notice that payments made by the SEIU to local affiliates were treated as chargeable when made to reimburse operating expenses, and non-chargeable when made to subsidize organizing activities.[4]  Plaintiffs do not make any claim to the contrary in their Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment (Docket # 68), nor do they make any citation to the Summary Judgment record regarding any alleged inadequacy of the SEIU audit or financial statement.  Defendants have demonstrated that Plaintiffs' objection may stem from confusion over a heading in the SEIU report that was initially entitled "Organizing campaign support," but was later corrected to read "Campaign Support and Field Operations." Even viewing the record in the light most favorable to Plaintiffs, there is simply no evidence before the Court that the service fees, as they now stand, are in any way subsidizing organizing activity at the MSEA or SEIU level.

### d.  Extra-Unit Litigation Costs May Be Included in the Service Fees

Plaintiffs also contend that the service fee improperly includes the cost of "extra-unit litigation," specifically the MSEA's contribution to costs incurred by the SEIU in litigating

---

[4] In Plaintiffs' Opposing Statement of Material Facts in Opposition to Defendant MSEA's Motion for Summary Judgment (Docket # 86) ("Plaintiffs' MSEA Response SMF"), Plaintiffs respond to Defendant MSEA's Statement of Material Facts as to Which There is No Genuine Issue (Docket # 70) ("MSEA's SMF").  MSEA's SMF at ¶18 states (with citations omitted): "The July Notice included the entire SEIU auditor's statement of the allocation of expenses for the 2003 fiscal year, including the auditor's notes.  The notes in that report explain that payments to SEIU's local affiliates were treated as chargeable if made as reimbursements for operating expenses, and nonchargeable if made as subsidies for organizing."  In response, Plaintiffs state only that: "The first sentence is Admitted. The second sentence is Qualified, as those notes speak for themselves."  (Plaintiff's MSEA Response SMF (Docket # 86) at ¶18).  The Court agrees, and finds that the notes do indeed clearly lay out the SEIU's categorization of chargeable and nonchargeable expenses.

actions outside the State of Maine.  The Court does not find any constitutional problem with the decision to include the SEIU's extra-unit litigation in the service fee.  Plaintiffs disingenuously cite to <u>Lehnert v. Ferris Faculty Ass'n</u>, 500 U.S. 507, 528 (U.S. 1991), and specifically to paragraph IV-B, to support their statement that "the Supreme Court in *Lehnert* found [extra-unit litigation] to be completely nonchargeable."  (Pls.' Mot. for Summ. J. (Docket # 67) at 27.)  Plaintiffs' quotation relies on a portion of Justice Blackmun's opinion that was joined only by Chief Justice Rehnquist and Justices White and Stevens.  <u>Lehert</u>, 500 U.S. at 507, 510.  Thus, this portion of <u>Lehnert</u> does not state a majority opinion that is binding on this Court.  Those circuit courts that have ruled on the issue have found that it is constitutionally permissible for unions to include extra-unit litigation expenses in the service fees charged to nonmembers.  <u>See Reese v. City of Columbus</u>, 71 F.3d 619, 624 (6th Cir. 1995) (affirming the dissolution of an injunction where nonmembers benefited from being charged for extra-unit litigation and were therefore unlikely to succeed on their claim); <u>Otto v. Pennsylvania State Educ. Ass'n</u>, 330 F.3d 125, 138 (3rd Cir. 2003) (upholding extra-unit litigation expenses by applying <u>Lehnert</u>'s three-part chargeability test).  Following these appeals court rulings, this Court similarly holds as a matter of law that the inclusion of the cost of extra-litigation does not violate Plaintiffs' constitutional rights.

### e.   No Advance Reduction in Fees is Constitutionally Required

Plaintiff also persists in its claim that the MSEA, by failing to initially categorize organizing expenses as non-chargeable, unconstitutionally failed to calculate an advance reduction in the service fee.   As the Court has already discussed, <u>Hudson</u> does not require unions to make a good-faith effort to determine the correct proportionate share in advance, but rather to give adequate notice that will provide the nonmember enough information to decide

whether to object.  Moreover, under <u>Hudson</u> the use of an impartial arbitrator and the escrowing of objectors' fees pending resolution of the complaint is sufficient to safeguard the nonmembers' constitutional rights.[5]  Here, the MSEA has placed all objecting nonmember service fees in an escrow account pending the ruling from the impartial arbitrator, as required under the CBA and the July Notice.  There is therefore no constitutional violation under <u>Hudson</u>.

### f. The MSEA Process Allowing Nonmembers to Challenge Service Fees is Constitutional

The MSEA also established constitutionally permissible methods for allowing Nonmembers to object to the amount of the service fee.  In <u>Hudson</u>, the Court found that the local union's method of allowing challenges to the fee was insufficient to protect employees' First Amendment rights against compelled speech and association.  <u>Id.</u> at 310.  There, the service fees were automatically deducted from nonmembers' paychecks, and employees could object to the fees only within thirty days of that first deduction.  <u>Id.</u> at 296.  The objections would not be considered by an impartial party, but rather by the union's Executive Committee, then the union's Executive Board, and finally by an arbitrator selected by the union's president.  <u>Id.</u>  A prevailing objector would receive a rebate of any wrongfully-deducted fees, and future fees would be reduced to the newly-established amount for all other Nonmembers.  <u>Id.</u>

---

[5] As explained in the Court's Order on Motion for Preliminary Injunction:

> The Court notes that several Circuits, including the Second, Third, Fourth, Ninth, and Eleventh have held that an escrow of service fees that complies with Hudson's requirements adequately protects nonmembers' First Amendment rights.  <u>See</u> <u>Grunwald v. San Bernardino City Unified Sch. Dist.</u>, 994 F.2d 1370, 1374 (9th Cir. 1993); <u>Gibson v. The Florida Bar</u>, 906 F.2d 624, 631 (11th Cir. 1990), cert. dismissed, 112 S. Ct. 633 (1991); <u>Crawford v. Air Line Pilots Ass'n Int'l</u>, 870 F.2d 155, 161 (4th Cir. 1989); <u>Hohe v. Casey</u>, 868 F.2d 69, 72 (3d Cir.), cert. denied, 493 U.S. 848 (1989); <u>Andrews v. Education Ass'n</u>, 829 F.2d 335, 339 (2d Cir. 1987).  Indeed, these holdings seem to best comport with the Supreme Court's suggestion in <u>Ellis v. Brotherhood of Railway, Airline & Steamship Clerks</u> that "advance reduction of dues and/or interest-bearing escrow accounts" would protect nonmembers from any First Amendment violations.  466 U.S. 435, 444 (1984) (emphasis added).

<u>Locke</u>, 382 F. Supp. 2d at 191.

14

The method employed by the MSEA for considering such objections does not raise these constitutional considerations.  As provided for in the CBA, Nonmembers who challenge the service fee will have their payments placed in an interest-bearing escrow account while the dispute is heard before an independent arbitrator following the American Arbitration Association's Rules for Impartial Determination of Union Fees.  (See CBA (Docket # 71, Ex. 2) at 58.)  Should the State discover that an employee has failed either to pay or challenge the service fee, the employee will receive a thirty-day period in which they must pay the fee, with arrears.  (Id.)  An employee who fails to do so will be given a notice of proposed dismissal and will be entitled to meet with the appointing authority, and be heard, before being dismissed.  (Id.) These requirements ensure that the standards laid out in Hudson, namely that challenged nonmember fees be places in escrow and that the arbitration process be independent from the union, are met.  Hudson, 475 U.S. at 308.

Having considered Plaintiffs' multiple claims that the service fee and the notice and process for challenging the service fee are constitutionally inadequate, the Court concludes that these claims are without merit.  Thus, the Court finds Defendants are entitled to summary judgment on Plaintiffs' 42 U.S.C. § 1983 claim.

### B.  Indemnification Provision

Plaintiffs also seek to void the indemnification clause in the CBA, claiming it violates public policy, as it causes the State to "ignore consideration of whether the collection of agency fees violates the constitutional rights of nonunion State employees."  (Pls.' First Am. Compl. (Docket # 47) at ¶47.)  The entirety of their argument rests on the premise that the MSEA could indemnify the State for deprivations of Nonmembers' federal constitutional rights.  To that end,

Plaintiffs quote the original indemnification provision from the CBA, and ignore the October 18, 2005 revision to the CBA that provides that "nothing herein shall require Indemnification for any intentional deprivation of an individual's constitutional rights by the State." (2005–2007 Agreement Between the State of Maine and the MSEA-SEIU (Docket # 66, Ex. A) at 2.) Plaintiffs later state in their Consolidated Reply to Defendants' Oppositions to Plaintiffs' Motion for Summary Judgment that they do not address this portion of the modification provision because it is "not material." (Pls.' Consol. Reply to Defs.' Opp'n to Pls.' Mot. for Summ. J. (Docket # 88) at 18.) The Court disagrees, and, as Plaintiffs have provided no reason not to do so, considers only the indemnification clause that is currently in effect.

### 1. Standing

Before reaching the merits of the arguments, the Court must determine whether Plaintiffs have standing to challenge the indemnification clause. In order to meet the minimal constitutional requirements for standing, the Plaintiffs must meet three criteria: (1) they must demonstrate an injury in fact, which is "concrete, distinct and palpable, and actual or imminent"; (2) they must establish a causal connection between the injury and the defendant; and (3) they must demonstrate "substantial likelihood that the requested relief will remedy the alleged injury in fact." McConnell v. Federal Election Com'n, 540 U.S. 93, 225 (2003) (internal citations omitted). There are no First Circuit cases specific to standing in a similar indemnification claim, so the Court must look elsewhere for guidance. In Prescott v. County of El Dorado, 298 F.3d 844 (9th Cir. 2002), cert. denied, 537 U.S. 1188 (2003), the Ninth Circuit addressed a fact pattern similar to the one before the Court.[6] There, the court found no causal relationship between the indemnification clause and

---

[6] Plaintiffs' argument that the Court should ignore Prescott because the Ninth Circuit has been regularly overturned by the Supreme Court (Resp. in Opp'n to MSEA Defs.' Mot. for Summ. J. (Docket # 84) at 27-28) is extraordinarily unpersuasive, in particular because Plaintiffs do not provide any analysis specific to Prescott itself. The Supreme

Plaintiffs' purported injuries.  In <u>Prescott</u>, as here, the plaintiffs' only cognizable injury was that "the union did not give them adequate notice of the basis of the fees."  <u>Id.</u> at 845.  The court also found little link between the indemnification clause and the State's willingness to terminate the nonmember for failure to pay.  The <u>Prescott</u> court concluded that "the challenged indemnification clause upon which the employer insisted caused neither the union to furnish, nor the plaintiffs to receive, inadequate notice."  <u>Id.</u> at 846.  The Court finds much of this analysis persuasive, particularly in a case such as this, where Plaintiffs did not receive inadequate notice or otherwise suffer injury.

The question is made difficult by Plaintiffs, who spend little time addressing this argument, finding it an "invitation into irrationality" (Pls.' Mot. for Summ. J. (Docket # 67) at 15) and "absurd" (Resp. in Opp'n to MSEA Defs.' Mot. for Summ. J. (Docket # 84) at 67). They argue that they suffered injury simply because the State agreed to enforce a "forced-unionism provision" (<u>Id.</u> at 29) and further suffered injury when they were told that Nonmembers would face termination should they refuse to pay the fee (Pls.' Mot. for Summ. J. (Docket # 67) at 16).  As discussed earlier in this Order, it is constitutional for unions to collect service fees, and it is constitutional for the State to enforce such a collection, provided the safeguards in <u>Hudson</u> are met.  These are therefore not "injuries" suffered by the Plaintiff. Plaintiff raises only one other potential injury: the possibility that the State might enforce the service fee requirement in the absence of the <u>Hudson</u> safeguards.  (Resp. in Opp'n to MSEA Defs.' Mot. for Summ. J. (Docket # 84) at 30.)  Plaintiffs cite four cases to support their premise, and reading generously into their argumentation, contend that because the opinions reached the merits of the issue the courts must have found standing.  See <u>Wessel v. City of Albuquerque</u>, 299

---

Court saw fit to let stand the Ninth Circuit's holding in <u>Prescott</u>, and this Court therefore sees no reason to dismiss the analysis in <u>Prescott</u> out of hand.

F.3d 1186 (10th Cir. 2002); Hohe v. Casey, 956 F.2d 399 (3rd Cir. 1992); Weaver v. University of Cincinnati, 970 F.2d 1523 (6th Cir. 1992); Stamford Bd. of Educ. v. Stamford Educ. Ass'n 697 F.2d 70 (2nd Cir. 1982).

Only one of these cases addressed standing, although the question was not before it, finding that an injury (and therefore standing) existed because "the nonmembers' entire argument presumes that, if the City faced potential liability, it would have prevented the fair share fees from being deducted unconstitutionally from the nonmembers' paychecks." Wessel, 299 F.3d at 1199. Plaintiffs give no argument as to why they would have standing on this point, despite the fact that they suffered no injury under Hudson,[7] nor do they offer any arguments as to how voiding the indemnification provision would prevent such an injury in the future. In short, the Court has grave misgivings as to whether Plaintiffs have standing to challenge the indemnification provision. Nonetheless, in the absence of guidance from the First Circuit, the Court will assume that Plaintiffs have standing in order to reach the merits of the parties' arguments.

### 2.   Public Policy Considerations

Although there is no First Circuit authority to guide the Court in its consideration of the indemnification provision on the merits, there is authority from other circuits - albeit mixed. One circuit has struck down such provisions when they allow indemnification for intentional deprivation of constitutional rights, two have struck down such provisions when they are silent as to indemnification for intentional deprivation of rights, and one has upheld such silent provisions. None have involved situations, such as here, where the indemnification provision explicitly excluded coverage for intentional deprivation of constitutional rights.

_____

[7] Plaintiffs also appear to argue that the service fee, which they refer to throughout as "forced unionism," is itself an injury that the indemnification clause enables and encourages. The constitutionality of service fees themselves, however, is not before the Court.

The indemnification provision in this case can clearly be distinguished from the Second Circuit's decision in Stamford, which struck down an indemnification provision that was used to indemnify an employer for intentional discrimination.   There, the Second Circuit found indemnification provisions to be void as against public policy only when they allow indemnification for the public employer's intentional deprivation of the employee's constitutional rights.  In Stamford, the indemnification provision at issue protected an agreement between the school board and the union that explicitly contained separate and discriminatory pay scales for male and female sports coaches.  Stamford, 697 F.2d at 71.  The court's concern was intentional discrimination, and particularly that a public employer "will have little reason to be concerned over whether labor agreements discriminate against women" knowing that they will be indemnified.  Id. at 73.  See also Gibbs-Alfano v. Burton, 281 F.3d 12, 22 (2nd Cir. 2002) (limiting the Stamford holding to cases of discriminatory conduct).  This is not a concern here, where the indemnification provision specifically prohibits indemnification for the State's "intentional deprivation of an individual's constitutional rights."

The indemnification at issue here can also be distinguished from those considered by the Tenth Circuit (in Wessel), the Sixth Circuit (in Weaver), and the Third Circuit (in Hohe).  In a split decision striking down the indemnification provision, the Tenth Circuit found that both the employer and the union have a burden to carry out the Hudson requirements, and that both parties must have "ample incentive to put proper procedures in place."  Wessel, 299 F.3d at 1198.  In the most stringent critique of indemnification provisions, the Sixth Circuit, in finding that an employer has unique duties under Hudson, struck down the indemnification provision after finding that it allowed the employer to follow the union's procedures, despite the fact that they might fail to comply with the Hudson standards.  See Weaver, 970 F.2d at 1538.  It found

that "a clause that relieves the employer of all consequences for its failure to assume and conscientiously carry out its duties, including even the cost of defending legal actions, is against public policy."  Id.  Finally, in Hohe, the Third Circuit upheld the indemnification provision, finding that even with indemnification a Nonmember whose rights had been violated under Hudson would still be able to collect costs and fees from the State.  The Third Circuit made this finding despite the fact that the indemnification clause did not prohibit indemnification for intentional constitutional violations.  Hohe, 956 F.2d at 411.

Unlike the public employer in all of the above cases, it is clear that the State of Maine is not lacking in incentive to ensure that the Hudson requirements are met, and it is also clear that the indemnification provision would not insulate the State from the consequences of failing to carry out its duties.  The Court is assured that the indemnification provision in this case, which carries a strong incentive for the State to ensure that it does not commit any intentional deprivations of Nonmembers' constitutional rights, is sufficient to safeguard against the harms pondered by the Weaver and Wessel courts.

Having considered the available precedent and the specific indemnification provision at issue here, the Court cannot conclude that the indemnification provision is void against public policy.  In the cases cited above, the public employer was eligible for indemnification even for intentional violation of Nonmembers' constitutional rights.  Here, the State has an incentive to ensure that it takes no action to violate the constitutional rights of Nonmembers, as such intentional actions would not be eligible for indemnification.  Moreover, the MSEA undoubtedly has a strong incentive to protect the constitutional rights of Nonmembers, as failure to do so would lead to costly legal battles, and Nonmembers whose rights are violated would still be able to bring action and recover against the MSEA for those violations.  In short, the State is not

indemnified for its own unconstitutional actions, including the termination of an employee who has refused to pay a service fee that fails to comply with <u>Hudson</u>'s requirements.


**IV.  CONCLUSION**

For these reasons, Plaintiffs' Motion for Leave (Docket # 89) is hereby GRANTED, Plaintiffs' Motion for Summary Judgment (Docket # 67) and Plaintiffs' Motion for Oral Argument/Hearing (Docket # 74) are hereby DENIED, and Defendants' Motions for Summary Judgment (Dockets # 64 & 73) are hereby GRANTED.  Plaintiffs' Renewed Motion for Class Certification (Docket # 55) is therefore MOOT.


SO ORDERED.

/s/ George Z. Singal
Chief U.S. District Judge

Dated this 31st day of March, 2006.